IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) SUPERSEDING INDICTMENT |
| | ) |
| Plaintiff, | ) CRIMINAL NO. 00-001 (PG) |
| | ) |
| v. | ) VIOLATIONS: |
| | ) |
| [1] UBALDO RIVERA-COLON, | ) COUNT 1: CONSPIRACY TO |
| A/K/A OSVALDO RIVERA, A/K/A | ) POSSESS WITH INTENT TO |
| USVALDO RIVERA, (Cts. 1,2,3,5) | ) DISTRIBUTE A CONTROLLED |
| [2] DALE CHESTER BROWNE, (Cts. 1,6,7,8,9) | ) SUBSTANCE |
| [3] OSCAR TRINIDAD-RODRIGUEZ, | ) 21 U.S.C. §846; 21 U.S.C. §841(a)(1) |
| A/K/A "EUGGIE" (Ct. 2) | ) |
| [4] RUBEN ESTRADA-RODRIGUEZ, (Ct. 2) | ) COUNT 2: CONSPIRACY TO |
| [5] BASILIO RIVERA-RODRIGUEZ, (Ct. 2) | ) COMMIT MONEY LAUNDERING |
| [6] ALEXIS ALICEA-KIPP, | ) 18 U.S.C. §1956(h); 18U.S.C. |
| A/K/A "ALITO," (Ct.2) and | ) §1956(a)(1)(B)(i)&(ii) |
| [7] ELENA CORCHADO-PERALTA, (Cts. 2,4) | ) |
| [8] PEDRO CRUZ-ROBLES, | ) COUNTS 3, 4 & 6: BANK FRAUD |
| A/K/A/ "ICO", (Ct. 2) | ) 18 U.S.C. §1344 |
| [9] UBALDO RIVERA ARCHILLA, (Ct. 5) | ) |
| [10] ANA DE JESUS MALDONADO,  (Ct.9) | ) COUNT 5: BANK FRAUD |
| | ) 18 U.S.C. §1344; 18 U.S.C. §2 |
| Defendants. | ) |
| | ) COUNTS 7 & 8:  DELIVERY OF A |
| | ) CONTROLLED SUBSTANCE |
| | ) 21 U.S.C. §841(a)(1) |
| | ) |
| | ) COUNT 9:  CONSPIRACY TO |
| | ) COMMIT MONEY LAUNDERING |
| | ) 18 U.S.C. §1956(h); 18U.S.C. |
| | ) §1956(a)(1)(B)(i)&(ii) |
| | ) |
| | ) FORFEITURE ALLEGATIONS |
| | ) 18 U.S.C. §982 and 21 U.S.C. §853 |

THE GRAND JURY CHARGES:

**COUNT ONE**
**(Conspiracy to Possess with Intent to Distribute a Controlled Substance)**

Beginning in or about the month of January 1987, up to and including about the month of



Indictment
Page No. 2

December 1996, in the District of Puerto Rico and elsewhere, and within the jurisdiction of this

Court, defendants:

## [1] UBALDO RIVERA-COLON, and
## [2] DALE CHESTER BROWNE

did knowingly and intentionally combine, conspire, confederate and agree together, with each other

and with other persons known and unknown to the grand jury to commit the following offense

against the United States, to wit: knowingly and intentionally to possess with the intent to distribute

more than 150 kilograms of a mixture and substance containing a detectable amount of cocaine, a

Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and

§ 846.

### Introduction

At all times relevant to this Indictment:

    1.  UBALDO RIVERA-COLON and DALE CHESTER BROWNE resided in Puerto Rico.

    2.  UBALDO RIVERA-COLON, as the head of the organization, negotiated drug deals with

individuals who supplied him with cocaine, individuals who purchased cocaine from him, and

individuals who held positions in the government who could assist him in transporting the cocaine

from Colombia, through the Dominican Republic to Puerto Rico and into the United States.

    3.  DALE CHESTER BROWNE, a primary associate of UBALDO RIVERA-COLON, was

responsible for the security, transportation, storage and sale of cocaine possessed by the

organization.

### Overt Acts

In furtherance of the conspiracy, and to achieve the objects thereof, the defendants and their

Indictment
Page No. 3

co-conspirators committed, among others, the following overt acts in the District of Puerto Rico and elsewhere:

1. In 1987, a co-conspirator (CC1) was introduced to UBALDO RIVERA-COLON by Vladimir Collazo-Leon a/k/a "Tutin," an active drug dealer. CC1 supplied UBALDO RIVERA-COLON with more than 200 kilograms of cocaine between 1987 and 1991. The cocaine was delivered to UBALDO RIVERA-COLON in Puerto Rico.

2. In or about October 1992, a second co-conspirator (CC2) contacted the UBALDO RIVERA-COLON drug dealing organization and arranged to purchase 10 kilograms of cocaine from UBALDO RIVERA-COLON. That cocaine was delivered by DALE CHESTER BROWNE to the parking lot of Caparra Classic Condominiums, Guaynabo.

3. In April 1993, CC3 contacted a member of UBALDO RIVERA-COLON'S drug dealing organization Jorge Hernandez a/k/a "El Cubano" and arranged to purchase an additional 10 kilograms of cocaine from UBALDO RIVERA-COLON. CC3 paid $13,000 per kilogram for the cocaine and delivered the cash to UBALDO RIVERA-COLON. The cocaine was delivered by DALE CHESTER BROWNE to the parking lot of an auto stereo center in Puerto Rico. Hernandez was later shot five times and killed.

4. In the fall of 1994, a third co-conspirator (CC3) was present at a drug deal where UBALDO RIVERA-COLON sold between 25-40 kilograms of cocaine to a fourth co-conspirator (CC4). The deal took place in a mechanic shop in Guaynabo.

5. In the summer of 1995, UBALDO RIVERA-COLON gave CC4 10 kilograms of cocaine and ordered CC4 to deliver the cocaine to a relative of UBALDO RIVERA-COLON in Puerto Rico.

Indictment
Page No. 4

The fourth co-conspirator made the delivery to a location in San Juan.

6. In late 1995 or early 1996, CC4 received about 200 kilograms of cocaine from UBALDO

RIVERA-COLON and DALE CHESTER BROWNE in Puerto Rico. That cocaine was distributed

by CC4 to local dealers in the San Juan area.

All the foregoing acts were committed in violation of Title 21, United States Code, Sections

841(a)(1) and 846.

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

Beginning in or about January 1990, up to and including the time of the filing of this

indictment, in the District of Puerto Rico, elsewhere and in the jurisdiction of this Court, defendants:

> **[1] UBALDO RIVERA-COLON,**
> **[3] OSCAR TRINIDAD-RODRIGUEZ,**
> **[4] RUBEN ESTRADA-RODRIGUEZ,**
> **[5] BASILIO RIVERA-RODRIGUEZ,**
> **[6] ALEXIS ALICEA-KIPP,**
> **[7] ELENA CORCHADO-PERALTA, and**
> **[8] PEDRO CRUZ-ROBLES**

did knowingly and intentionally combine, conspire, confederate and agree together, with each other

and with other persons known and unknown to the grand jury to commit the following offense

against the United States, to wit: conducting financial transactions affecting interstate commerce

with a financial institution, which financial transactions involved more than $2,000,000 in proceeds

of a specified unlawful activity, that is the distribution of a controlled substance in violation of Title

21 United States Code, Section 841(a)(1), knowing that such financial transactions were designed

in whole or in part to conceal or disguise the nature, location, source, ownership or control of the

proceeds of the specified unlawful activity and to done to avoid a transaction reporting requirement

Indictment
Page No. 5

under state or federal law, while knowing that the property involved in the financial transactions

represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. Sections

1956(a)(1)(B)(i)(ii) and 1956(h).

### Introduction

At all times relevant to this Indictment:

1. UBALDO RIVERA-COLON, OSCAR TRINIDAD-RODRIGUEZ, RUBEN ESTRADA-

RODRIGUEZ, BASILIO RIVERA-RODRIGUEZ, ALEXIS ALICEA-KIPP, ELENA

CORCHADO-PERALTA and PEDRO CRUZ-ROBLES resided in Puerto Rico.

2. UBALDO RIVERA-COLON and his wife, ELENA CORCHADO-PERALTA, never

reported an income of greater than $40,000 on their Puerto Rican (Hacienda) tax returns. The total

reported income of UBALDO RIVERA-COLON for the years 1992 through 1997 was less

$150,000.

3. OSCAR TRINIDAD-RODRIGUEZ, RUBEN ESTRADA-RODRIGUEZ, BASILIO

RIVERA-RODRIGUEZ, ELENA CORCHADO-PERALTA and PEDRO CRUZ-ROBLES

participated in the conspiracy by purchasing money orders, manager's checks and other financial

instruments and by participating in other financial transactions with cash received from drug sales.

These financial instruments were then used to purchase expensive properties such as cars, boats, and

real estate for UBALDO RIVERA-COLON.

4. OSCAR TRINIDAD-RODRIGUEZ and RUBEN ESTRADA-RODRIGUEZ were

nominees or "straw" owners of property purchased with the drug proceeds of UBALDO RIVERA-

COLON's drug trafficking organization.

Indictment
Page No. 6

5.  UBALDO RIVERA-COLON maintained a bank account in the name of a fraudulent company called "Super Ganado."

6.    BASILIO RIVERA-RODRIGUEZ conducted financial transactions with various accounts of BVF Construction, a company owned and operated by RIVERA-RODRIGUEZ using cash proceeds of drug dealing provided by UBALDO RIVERA-COLON.

7.  ALEXIS ALICEA-KIPP assisted in the transportation, accounting and transfer of cash proceeds of drug dealing, as well as permitting his name to be used to conceal the identity of the true owner of the property.

**Overt Acts**

In furtherance of the conspiracy, and to achieve the objects thereof, the defendants and their co-conspirators committed, among others, the following overt acts in the District of Puerto Rico and elsewhere:

1.    **Previously/Subsequently Alleged Overt Acts**

The overt acts alleged in paragraphs 1-6 of Count One and the crimes alleged in Counts Three and Four of this indictment are realleged and incorporated herein.

2.    **Purchase of Condominium Caparra Classic #301**

In 1992, UBALDO RIVERA-COLON purchased Caparra Classic Condominium #301. He paid the owner of the condominium more than $200,000 cash and a BMW automobile. The sale of the condominium was negotiated and paid for by RIVERA-COLON. RIVERA-COLON and ELENA CORCHADO-PERALTA have lived in the condominium since 1992 and have claimed it as a residence and business address on several financial documents. However, at the request of

Indictment
Page No. 7

RIVERA-COLON, title to the condominium was placed in the name of RIVERA-COLON'S mother.

The following financial transactions were conducted to complete the purchase of Condominium

Caparra Classic #301:

a. On September 30, 1992, UBALDO RIVERA-COLON, accompanied by his mother and

the owner/seller of Caparra Classic #301, went to a local attorney's office to complete paperwork

regarding the purchase of the condominium. At the attorney's office, the seller of the condominium

received Banco Popular Official Check #1-240-005182 in partial payment for the condo. The

remitter of the check was RIVERA-COLON'S mother and the check was made out to the seller in

the amount of $45,000. The seller also received a document regarding the transfer of a BMW from

UBALDO RIVERA-COLON to the seller.

b. On the night of September 30, 1992, UBALDO RIVERA-COLON, ALEXIS ALICEA-

KIPP, and Jorge Hernandez, went to Caparra Classic #301 to conduct further financial transactions

to complete the sale of the condominium. The defendants brought $85,000 cash to the apartment.

The money was counted by ALICEA-KIPP and delivered to the seller. A handwritten receipt for

the transaction was completed and signed by the seller and by ALICEA-KIPP. The receipt reads that

the $85,000 was received from UBALDO RIVERA-COLON in partial payment for "Apt 301."

c. While the transaction described in paragraph "b" above was being conducted, UBALDO

RIVERA-COLON discussed the drug business with the seller of the condominium. At that time,

both were actively engaged in drug dealing. RIVERA-COLON told the seller that he (RIVERA-

COLON) had purchased winning lottery tickets in order to conceal the source of the money used to

pay for the condominium. ALICEA-KIPP was present during these conversations.

Indictment
Page No. 8

d. Following the transactions on September 30, 1992, the seller of the condominium received about 10 additional cash payments of between $16,000 and $25,000 from UBALDO RIVERA-COLON in payment for the condominium.

3.    **Purchase of 40'Racing Boat *Budweiser* Serial Number DUX91362G091-4002**

In late 1993 or early 1994, UBALDO RIVERA-COLON and OSCAR TRINIDAD-RODRIGUEZ contacted Bobby Moore's Prime Time Marine (PTM), a racing boat broker in Miami, Florida, to negotiate the purchase of the *Budweiser*. RIVERA-COLON purchased the boat from Champion Motors through PTM for $100,000. The following financial transactions were conducted to complete the purchase:

a.    On May 2, 1994, an individual not otherwise involved in the transaction, purchased Banco Santander Cheque Official, #1183032 with $9,000 cash. The check was payable to PTM. The cash used to purchase the check was supplied by TRINIDAD-RODRIGUEZ.

b.    Also on May 2, 1994, a second individual not otherwise involved in the financial transaction, purchased a $9,000 Manager's Check, #038015, from First Federal Saving Bank in Puerto Rico. The check was also made payable to PTM.

c.    The next day, May 3, 1994, TRINIDAD-RODRIGUEZ used cash to purchase Banco Popular Personal Money Orders #240-031521 through #240-031525 for a total of $8,960. That same day, at a different Banco Popular branch, he purchased Personal Money Orders #040-169719 through #040-169721 for a total of $7,000. These eight separate checks were all payable to PTM.

d.    On May 4, 1994, the checks referred to in paragraphs "a", "b" and "c" above were deposited into the Sun Bank of South Florida account of PTM in partial payment for the *Budweiser*.

Indictment
Page No. 9

    e.  On May 5, 1994, $1,000 cash was deposited in the Sun Bank account of PTM. The cash was provided by TRINIDAD-RODRIGUEZ in partial payment for the *Budweiser*.

    f.  On May 5, 1994, Carolina Racing Engines, a racing boat engine company in Ft. Lauderdale, Florida, issued a $10,000 check to the PTM. RIVERA-COLON directed Carolina Racing Engines to issue the check in payment for a used boat engine the company had purchased from RIVERA-COLON.

    g.  On May 7, 1994, Nimay Auto, a car dealership in Puerto Rico, issued a certified check to PTM in the amount of $30,000.

    h.  On May 12, 1994, the checks from Nimay Auto and the Carolina Racing Engines, described in paragraphs "f" and "g" above, were deposited into the Sun Bank account of PTM. The checks were delivered by RUBEN ESTRADA and were used as partial payment for the *Budweiser*.

    i.  On May 23, 1994, a $15,000 Citibank money order payable to PTM was delivered by TRINIDAD-RODRIGUEZ to PTM and deposited in the PTM Sun Bank account as partial payment for the *Budweiser*.

    j.  On May 26, 1994, PTM transferred $15,000 from its escrow account to its business checking account. According to business records, the transfer was done for TRINIDAD-RODRIGUEZ and was used as partial payment for the *Budweiser*.

    k.  On May 31, 1994, PTM issued a check for $100,000, on behalf of UBALDO RIVERA-COLON, to Champion Motors as payment in full for the *Budweiser*.

**4.   Purchase of 40' Racing Boat *Katana* Serial Number DUX944651394-4023**

    In mid-1994, UBALDO RIVERA-COLON bought the 40' racing boat *Katana*. Although the

Indictment
Page No. 10

boat was owned by a third party, it was stored on the property of Prime Time Marine (PTM).

The owner of the *Katana* was selling it and buying a new 46' racing boat. The owner

instructed RIVERA-COLON to make payments for the *Katana* to the builder of the 46' racing boat,

Douglas Marine. The following financial transactions were conducted to complete the purchase the

*Katana*:

a.   Between July and November of 1994, UBALDO RIVERA-COLON and OSCAR

TRINIDAD-RODRIGUEZ delivered more than $230,000 in cash to Billy Ford, the owner of D &

B Carpet d/b/a Ford's Tile Service, a Plantation, Florida carpet/tile business. RIVERA-COLON told

Ford to deposit the cash into the tile service's Union Bank checking account in transactions of less

than $10,000.

b. Between August and November 1994, RIVERA-COLON instructed Ford to issue the

following checks, totaling $225,000, from the Union Bank account:

| DATE | CHECK # | AMOUNT | PAYEE |
|---|---|---|---|
| September 12, 1994 | 2528 | $30,000 | Douglas Marine |
| September 14, 1994 | 2531 | $30,000 | Douglas Marine |
| September 19, 1994 | 2533 | $30,000 | Douglas Marine |
| September 22, 1994 | 2534 | $30,000 | Douglas Marine |
| October 25, 1994 | 2624 | $30,000 | Douglas Marine |
| October 28, 1994 | 2625 | $30,000 | Douglas Marine |
| November 4, 1994 | 2674 | $3,390 | Douglas Marine |
| November 8, 1994 | 2677 | $20,000 | Douglas Marine |
| November 8, 1994 | 2678 | $21,610 | Custom Marine |

c.   The above checks used to buy the 40' racing boat *Katana*.

Indictment
Page No. 11

## 5.    Purchase of Lexus

In January and February 1995, UBALDO RIVERA-COLON financed the purchase of a 1995 Lexus from a dealership then known as Euromotion for $65,000. The following transactions were conducted to complete the purchase of the Lexus:

a. On February 28, 1995, a Citibank check in the amount of $50,000 payable to UBALDO RIVERA-COLON was deposited into a First Bank of Puerto Rico checking account opened by UBALDO RIVERA-COLON d/b/a "Super Ganado."

b. On March 1, 1995, UBALDO RIVERA-COLON wrote a check payable to Euromotion on the "Super Ganado" account in the amount of $10,000.

c. On February 27, 1995, RUBEN ESTRADA-RODRIGUEZ purchased the Lexus with a $17,500 Bansander Leasing Check payable to Charimar Auto Sales, the $10,000 "Super Ganado" check referred to in paragraph "b", $8,000 cash and $20,500 given on a 1994 Dodge Intrepid which was used as a trade in.

d. Later in 1995, the Puerto Rico Department of the Treasury (Hacienda) seized the Lexus from ELENA CORCHADO-PERALTA who claimed ownership of the car.

## 6.    BVF Construction

BVF Construction (BVF) is owned and operated by BASILIO RIVERA-RODRIGUEZ in Puerto Rico. Although RIVERA-RODRIGUEZ denied any other activity with UBALDO RIVERA-COLON, such activity occurred on a several occasions.

a. From April 1995 through January 1996, proceeds from drug dealing were deposited in UBALDO RIVERA-COLON'S "Super Ganado" account.

Indictment
Page No. 12

b. On August 7, 1995, UBALDO RIVERA-COLON wrote a $130,000 check on his "Super Ganado" account payable to BVF. Also, on August 7, 1995, a First Bank of Puerto Rico official check in the amount of $65,000 payable to BVF was purchased by RIVERA-COLON'S father. These two checks, totaling $195,000, were taken to First Bank's Via Blanca branch in Caguas where RIVERA-COLON and RIVERA-RODRIGUEZ used them to purchase a Certificate of Deposit in the name of BVF Construction.

c. On November 30, 1995, RIVERA-RODRIGUEZ purchased a First Bank Manager's Check in the amount of $190,000 payable to RIVERA-COLON. That check was deposited back into the "Super Ganado" account.

### 7.    Purchase of 46' Racing Boat

In May and June of 1995, UBALDO RIVERA-COLON purchased a 46' racing boat for $300,000. That sale was conducted through Bobby Moore's Prime Time Marine (PTM). The following financial transactions were conducted to complete the purchase:

a. In May of 1995, UBALDO RIVERA-COLON sold the 40' racing boat *Katana* referenced in overt act "4" to Bobby Moore's Custom Marine for $195,000. The proceeds of that sale were used as partial payment for the 46' racing boat.

b. On June 23, 1995, BASILIO RIVERA-RODRIGUEZ deposited $89,900 cash into the BVF account. That same day, RIVERA-RODRIGUEZ purchased a First Bank Manager's Check in the amount of $105,000 payable to PTM.

c. On June 30, 1994, the Manager's Check referred to above was deposited into the PTM Sun Bank account as final payment for the 46' racing boat.

Indictment
Page No. 13

8.     **Purchase of 1996 Range Rover**

During the months of March and April 1996, UBALDO RIVERA-COLON purchased a 1996 Range Rover from Formula One Auto in Miami, Florida. Although the purchase price of the vehicle was $62,500, documentation provided by the company accounts for the receipt of only $55,000. The following financial transactions were conducted to complete the purchase:

a. On March 13, 1996, Luis Chevere purchased Banco Santander Cheque Oficial #1470754 which was made payable to Formula One in the amount $10,000. The check was given to Formula One in partial payment for the Range Rover.

b. On April 1, 1996, UBALDO RIVERA-COLON issued check number 101 on the "Super Ganado" account to Formula One in the amount of $10,000 in partial payment for the Range Rover.

c. Also on April 1, 1996, Formula One issued "Car Invoice" #5759 regarding the sale of the Range Rover. According to the invoice, the Range Rover was sold to Melvin Rivera of Charimar Auto for $62,500. While Rivera did pick up the vehicle for UBALDO RIVERA-COLON, he has never worked for Charimar Auto and did not purchase the vehicle.

d. On April 8, 1996, a jewelry store in Miami issued a check to Formula One in the amount of $9,500 as partial payment on the Range Rover. Earlier, UBALDO RIVERA-COLON had given a Cartier Pasha wristwatch to a salesman at Formula One in partial payment for the Range Rover. The salesman sold the watch to the jewelry store and applied the proceeds to the sale of the Range Rover.

e. On April 17, 1996, UBALDO RIVERA-COLON wrote check, number 109, on the "Super Ganado" account, payable to "Formula I" in the amount of $25,000. The check was partial

Indictment
Page No. 14

payment for the Range Rover.

f. On April 19, 1996, $40,000 was transferred from the BVF account of BASILIO RIVERA-

RODRIGUEZ to the "Super Ganado" account of UBALDO RIVERA-COLON. These funds helped

cover the check referred to in paragraph "5" above.

9.    **Purchase of Racing Boat Engines**

In April of 1996, UBALDO RIVERA-COLON purchased a racing boat motor from Power

Motors. The following transactions were conducted to complete the purchase of the motor:

a. On April 22, 1996, BASILIO RIVERA-RODRIGUEZ transferred $17,000 from three

different BVF checking accounts to RIVERA-COLON'S "Super Ganado" account.

b. Also on April 22, 1996, RIVERA-COLON transferred a $10,000 credit card advance to

the "Super Ganado" account.

c. On April 24, 1996, RIVERA-COLON deposited $3,000 cash into his "Super Ganado"

account.

d. Also on April 24, 1996, RIVERA-COLON purchased an official check from First Bank

with funds from his "Super Ganado" account. The official check was payable to Power Motors in

the amount of $52,000 and was used to purchase the racing boat engine.

10. **Purchase of Banco Popular Oficial Checques by Pedro Cruz**

a. In June of 1996, PEDRO CRUZ-ROBLES signed an application for Banco Popular

Cheque Oficial 31-000353823 payable to E. J. Auto in the amount of $66,000. The money was used

toward the purchase of an auto by UBALDO RIVERA-COLON. CRUZ-ROBLES completed the

transaction at the direction of RIVERA-COLON and RIVERA-COLON provided CRUZ-ROBLES

Indictment
Page No. 15

with the funds to complete the transaction.

    b. In August of 1996, PEDRO CRUZ-ROBLES signed an application for a Banco Popular

Cheque Oficial payable to UBALDO RIVERA in the amount of $78,000. The money was the return

of a down payment RIVERA-COLON had made to Prime Wholesalers for a 1996 Porsche Twin-

Turbo. Prime Wholesalers wrote a check to RIVERA-COLON WHO then gave the check to CRUZ-

ROBLES who completed the transaction at the direction of RIVERA-COLON.

    All the foregoing acts were committed in violation of Title 18, United States Code, Sections

1956(a)(1)(B)(i) & (ii) and 1956(h).

**COUNT THREE**
**(Bank Fraud)**

**A. Introduction**

At all times relevant to this indictment,

    1. Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. was a financial institution

with accounts and deposits insured by the Federal Deposit Insurance Corporation.

    2. UBALDO RIVERA-COLON was a resident of Puerto Rico.

    3. Contrary to his statements in the credit application, UBALDO RIVERA-COLON had not

been employed for four years as a manager with BVF Construction at a salary of $80,000 per year.

**B. Object of Scheme and Artifice**

    The object of UBALDO RIVERA-COLON'S scheme and artifice was to fraudulently obtain

funds and credit from Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. by providing

materially false information on an Individual Credit Application.

**C. The Scheme and Artifice to Defraud**

Indictment
Page No. 16

1. On or about September 26, 1996, in the District of Puerto Rico, UBALDO RIVERA-COLON did knowingly and wilfully devise a scheme and artifice to defraud Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. and obtain monies, funds and other property of value from Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. by means of false and fraudulent pretenses and representations.

2. It was part of the scheme and artifice to defraud that on about September 26, 1996, UBALDO RIVERA-COLON made false statements on a Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. Individual Credit Application.

**D. Execution of the Scheme and Artifice**

On or about September 26, 1996 within the District of Puerto Rico, UBALDO RIVERA-COLON for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money, funds and other property of value by means of false and fraudulent pretenses and representations from Banco Popular of Puerto Rico, Popular Leasing & Rental Inc., submitted a fraudulent and false Individual Credit Application to Banco Popular of Puerto Rico, Popular Leasing & Rental Inc.

All in violation of Title 18, United States Code, Section 1344.

## COUNT FOUR
### (Bank Fraud)

**A. Introduction**

At all times relevant to this indictment,

1. Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. was a financial institution

Indictment
Page No. 17

with accounts and deposits insured by the Federal Deposit Insurance Corporation.

2.  ELENA CORCHADO-PERALTA was a resident of Puerto Rico.

3.  Contrary to her statement in a credit application, ELENA CORCHADO-PERALTA had

not been employed for three years as an accountant with E J Auto Sales at a salary of $48,000 per

year.

## B. Object of Scheme and Artifice

The object of ELENA CORCHADO-PERALTA'S scheme and artifice was to fraudulently

obtain funds and credit from Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. by

providing materially false information on an Individual Credit Application.

## C. The Scheme and Artifice to Defraud

1.  On or about December 26, 1996, in the District of Puerto Rico, ELENA

CORCHADO-PERALTA did knowingly and wilfully devise a scheme and artifice to defraud Banco

Popular of Puerto Rico, Popular Leasing & Rental Inc. and obtain monies, funds and other property

of value from Banco Popular of Puerto Rico, Popular Leasing & Rental Inc. by means of false and

fraudulent pretenses and representations.

2.  It was part of the scheme and artifice to defraud that on about December 26, 1996,

ELENA CORCHADO-PERALTA made false statements on a Banco Popular of Puerto Rico,

Popular Leasing & Rental Inc. Individual Credit Application.

3.  It was part of the scheme and artifice to defraud that on about December 26, 1996,

ELENA CORCHADO-PERALTA submitted a forged letter from E J Auto that purported to verify

her employment and salary at that business.

Indictment
Page No. 18

## D. Execution of the Scheme and Artifice

On or about December 26, 1996 within the District of Puerto Rico, ELENA CORCHADO-PERALTA for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money, funds and other property of value by means of false and fraudulent pretenses and representations from Banco Popular of Puerto Rico, Popular Leasing & Rental Inc., submitted a fraudulent and false Individual Credit Application to Banco Popular of Puerto Rico, Popular Leasing & Rental Inc.

All in violation of Title 18, United States Code, Section 1344.

## COUNT FIVE
### ( Bank Fraud/Aiding and Abetting)

### A. Introduction

At all times relevant to this indictment,

1. Global Mortgage was a financial institution with accounts and deposits insured by the Federal Deposit Insurance Corporation.

2. UBALDO RIVERA-COLON and UBALDO RIVERA-ARCHILLA were residents of Puerto Rico.

3. Contrary to his statements on the Uniform Residential Loan Application, UBALDO RIVERA-ARCHILLA did not own the residence at 301 Caparra Classic, did not rent the residence at that address to UBALDO RIVERA-COLON and did not live in Ponce, Puerto Rico.

### B. Object of Scheme and Artifice

The object of UBALDO RIVERA-COLON'S and UBALDO RIVERA-ARCHILLA'S scheme and artifice was to fraudulently obtain funds and credit from Global Mortgage Corporation

Indictment
Page No. 19

by providing materially false information on a Uniform Residential Loan Application.

## C.  The Scheme and Artifice to Defraud

1.  On or about December 9, 1998, in the District of Puerto Rico, UBALDO RIVERA-COLON and UBALDO RIVERA-ARCHILLA did knowingly and intentionally aid, abet, counsel and induce one another to knowingly and wilfully devise a scheme and artifice to defraud Global Mortgage Corporation and obtain monies, funds and other property of value from Global Mortgage Corporation by means of false and fraudulent pretenses and representations.

2.  It was part of the scheme and artifice to defraud that on about December 9, 1998, UBALDO RIVERA-COLON and UBALDO RIVERA-ARCHILLA made false statements on a Uniform Residential Loan Application submitted to Global Mortgage Corporation.

## D.  Execution of the Scheme and Artifice

On or about December 9, 1998, within the District of Puerto Rico, UBALDO RIVERA-COLON and UBALDO RIVERA-ARCHILLA for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money, funds and other property of value by means of false and fraudulent pretenses and representations from Global Mortgage, submitted a fraudulent and false Individual Uniform Residential Loan Application to Global Mortgage Corporation.

All in violation of Title 18, United States Code, Sections 1344 & 2.

**COUNT SIX**
**(Bank Fraud)**

## A.  Introduction

At all times relevant to this indictment,

1. Doral Mortgage Corporation/Doral Federal Saving Bank was a financial institution with

Indictment
Page No. 20

accounts and deposits insured by the Federal Deposit Insurance Corporation.

2. DALE CHESTER BROWNE was a resident of Puerto Rico.

3. Contrary to his statements in the Uniform Residential Loan Application, DALE CHESTER BROWNE DALE CHESTER BROWNE had not been self-employed for twelve and one half years as a heavy equipment salesman.

**B. Object of Scheme and Artifice**

The object of DALE CHESTER BROWNE'S scheme and artifice was to fraudulently obtain funds and credit from Doral Mortgage Corporation/Doral Federal Saving Bank by providing materially false information on a Uniform Residential Loan Application.

**C. The Scheme and Artifice to Defraud**

1. On or about November 20, 1998, in the District of Puerto Rico, DALE CHESTER BROWNE did knowingly and wilfully devise a scheme and artifice to defraud Doral Mortgage Corporation/Doral Federal Saving Bank and obtain monies, funds and other property of value from Doral Mortgage Corporation/Doral Federal Saving Bank by means of false and fraudulent pretenses and representations.

2. It was part of the scheme and artifice to defraud that on about November 20, 1998, DALE CHESTER BROWNE made false statements on a Doral Mortgage Corporation/Doral Federal Saving Bank Uniform Residential Loan Application.

**D. Execution of the Scheme and Artifice**

On or about November 20, 1998 within the District of Puerto Rico, DALE CHESTER BROWNE for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain

Indictment
Page No. 21

money, funds and other property of value by means of false and fraudulent pretenses and

representations from Doral Mortgage Corporation/Doral Federal Saving Bank, submitted a

fraudulent and false Uniform Residential Loan Application to Doral Mortgage Corporation/Doral

Federal Saving Bank.

All in violation of Title 18, United States Code, Section 1344.

### COUNT SEVEN
### (Delivery of a Controlled Substance)

In or about February of March of 1998 in the District of Puerto Rico, and within the

jurisdiction of this Court, defendant:

### [2] DALE CHESTER BROWNE

did knowingly and intentionally distribute approximately 10 kilograms of a mixture and substance

containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title

21, United States Code, Section 841(a)(1).

### COUNT EIGHT
### (Delivery of a Controlled Substance)

In or about March or April of 1998 in the District of Puerto Rico, and within the jurisdiction

of this Court, defendant:

### [2] DALE CHESTER BROWNE

did knowingly and intentionally distribute approximately 10 kilograms of a mixture and substance

containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title

21, United States Code, Section 841(a)(1).

Indictment
Page No. 22

## COUNT NINE
### (Conspiracy to Commit Money Laundering)

Beginning in or about January 199, up to and including the time of the filing of this

indictment, in the District of Puerto Rico, elsewhere and in the jurisdiction of this Court, defendants:

### [2] DALE CHESTER BROWNE, and
### [10] ANA DE JESUS MALDONADO

did knowingly and intentionally combine, conspire, confederate and agree together, with each other

and with other persons known and unknown to the grand jury to commit the following offense

against the United States, to wit: conducting financial transactions affecting interstate commerce

with a financial institution, which financial transactions involved more than $200,000 in proceeds

of a specified unlawful activity, that is the distribution of a controlled substance in violation of Title

21 United States Code, Section 841(a)(1), knowing that such financial transactions were designed

in whole or in part to conceal or disguise the nature, location, source, ownership or control of the

proceeds of the specified unlawful activity and to done to avoid a transaction reporting requirement

under state or federal law, while knowing that the property involved in the financial transactions

represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. Sections

1956(a)(1)(B)(i)(ii) and 1956(h).

### Introduction

At all times relevant to this Indictment:

1. DALE CHESTER BROWNE and ANA DE JESUS MALDONADO resided in Puerto

Rico.

2. Between 1990 and 1996, DALE CHESTER BROWNE and ANA DE JESUS

Indictment
Page No. 23

MALDONADO filed no Puerto Rican (Hacienda) tax returns.

3. For the 1997 tax year, DALE CHESTER BROWNE and ANA DE JESUS MALDONADO declared net income of $38,600 on their Puerto Rican (Hacienda) tax return.

4. In financial documents filed on November 20, 1998 in the commission of Count Six above, DALE CHESTER BROWNE claimed a gross monthly income of $5,000.

5. In financial documents filed on May 20, 1999 DALE CHESTER BROWNE claimed a gross monthly income of more than $12,000. In these same documents, BROWNE claimed gross income in 1997 of $386,000 with a net income that year of $122,500 and a 1998 gross income of $515,000 with a net income of $181,600.

### Overt Acts

In furtherance of the conspiracy, and to achieve the objects thereof, the defendants and their co-conspirators committed, among others, the following overt acts in the District of Puerto Rico and elsewhere:

**1. Previously Alleged Overt Acts**

The overt acts alleged in paragraphs 1-6 of Count One and the crimes alleged in Counts Six, Seven and Eight of this indictment are realleged and incorporated herein.

**2. Checking Account Deposits**

a. During the calendar year 1997, DALE CHESTER BROWNE and ANA DE JESUS MALDONADO deposited over $59,000 cash into their Citibank checking account.

b. During the calendar year 1998, DALE CHESTER BROWNE and ANA DE JESUS MALDONADO deposited over $84,000 cash into their Citibank checking account.

c. During a portion of calendar year 1999, DALE CHESTER BROWNE and ANA DE

Indictment
Page No. 24

JESUS MALDONADO deposited over $22,000 cash into their Citibank checking account.

All the foregoing acts were committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) & (ii) and 1956(h).

**FORFEITURE ALLEGATIONS**

THE GRAND JURY FURTHER CHARGES THAT:

The Grand Jury hereby re-alleges the allegations contained in Counts One and Two as though fully set forth herein.

## A. Controlled Substances Trafficking Forfeitures

By virtue of the commission of the offense of conspiracy to knowingly and intentionally possess with the intent to distribute cocaine, a schedule II controlled substance, as charged in Count One of this indictment, defendants

[1] **UBALDO RIVERA-COLON and**
[2] **DALE CHESTER BROWNE,**

shall forfeit to the United States pursuant to Title 21, United States Code, Sections 853(a), 881(a)(6) and (a)(7), and any and all property constituting or derived from any proceeds the said defendants obtained directly or indirectly as a result of said violations, to wit, $6,000,000, as to which property the said defendants are jointly and severally liable, and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violations charged in Count One of this indictment, including but not limited to:

1. ONE URBAN APARTMENT #301, CONDOMINIUM CAPARRA CLASSIC, ORTEGON STREET, GUAYNABO, P.R., more fully described at the property registry for the Commonwealth of Puerto Rico as follows:

Indictment
Page No. 25

PROPRIEDAD HORIZONTAL: Unidad designada #301, localizada en el piso 3, tercer nivel del Condominio Caparra Classic, ubicado en el Barrio Pueblo Viejo de Guaynabo, Puerto Rico. Esta unidad tiene un area neta privada de aproximadamente 3,516.00, equivalentes a 326.77 metros cuadrados. Colinda por el: NORTE: en una distancia de 65' con pared exterior del edificio; SUR: en una distancia de 64'10" en parte con la unidad designada #302 y en parte con vestibulo del piso, con pared colindante con conducto al ascensor y con pared colindante con escalera del edificio; ESTE: en distancia de 65' 7", con pared exterior del edificio y por el OESTE: en distancia de 65' 7", con pared exterior del edificio. Consta de una antesala, por donde tiene su entrada principal, un medio bano, una sala, un comedor, una terraza que queda al Este del edificio, una terraza que queda al Oeste del edificio, un cuarto de maquina de los aires acondicionados, un linen closet, una lavanderia, cuatro dormitorios cada uno con un cuarto de bano y un salon familiar consiste de una unidad con divisiones interiores, la cual tiene acceso al pasillo comun a traves de su puerta principal.
ORIGEN: Finca #35,178, inscrita al folio 292 del tomo 984 de Guaynabo, inscripcion 1ra.
PROPRIETARIO REGISTRAL: Lourdes Colon Ortiz.

2.    ONE RURAL PROPERTY located at B-4 PASEO PANORAMICO, VILLAS DE MONTE VERDE, PONCE, P.R., more fully described at the property registry for the Commonwealth of Puerto Rico as follows:

RUSTICA: Predio de terreno ubicado en el Barrio Montes Llanos del termino municipal de Ponce, Puerto Rico, identificado como el solar Cuatro-B (4-B) del plano de inscripcion de la Urbanizacion Villas de Monte Verde, compuesto de cuatro mil metros cuadrados (4,000 M/C) colindando al Noreste, de los puntos dos al diez del plano de inscripcion en ocho alineaciones que suman noventa y seis metros con diez centimetros (96.10) con la carretera principal de la Urbanizacion. Al Oeste, del punto uno al punto diez, en ciento diez metros (110m) con el solar 5-B; y al Sur, del punto uno al punto dos, en setenta y tres metros con cincuenta centimetros (74.50) con el solar 3-B, formando una punta o cuchilla en dicho punto uno.

ORIGEN: Finca #819, inscrita al folio 264 del tomo 886 de Ponce II, inscripcion 4a.
PROPRIETARIO REGISTRAL: Ubaldo Rivera Archilla.

3.  ONE URBAN APARTMENT #14-A, CONDOMINIUM GRANADA, COSTA RICA

Indictment
Page No. 26

STREET, HATO REY, P.R., more fully described at the property registry for the Commonwealth

of Puerto Rico as follows:

> URBANA: Apartamento 14-A. Apartamento de tres dormitorios localizado
> en la esquina sureste de la 14ta.planta del edificio conocido como
> Condominio Granada situado en un solar de una cabida de 3,216.81 metros
> cuadrados que a su vez esta localizado en el bloque A de la Urbanizacion
> Hector A.Pineiro, situado en los barrios Martin Pena y Hato Rey del
> Municipio de San Juan, Puerto Rico. El apartamento tiene un area total de
> 1,358 pies cuadrados, equivalentes a 126.16 metros cuadrados, colindando
> por el NORTE, con la parte Este del area central comunal del piso y el
> espacio abierto sobre el patio de servicio del Condominio. SUR, con el
> espacio abierto sobre el patio Sur del condominio. ESTE, con el espacio
> abierto sobre al patio Este del Condominio y OESTE, con el apartamento 14-
> B del mismo edificio. El apartamento tiene su puerta de entrada por su
> esquina Noroeste por donde tiene salida al vestibulo central del piso, que a
> su vez lo conecta con los elevadores y las escaleras del edicio a traves de los
> cuales al apartamento tiene acceso a las demas plantas del condominio y a sus
> patios y calles circundantes.   Este apartamento tiene las siguientes
> dependencias: cocina, laundry, sala-comedor, balcon, 5 closets, tres
> dormitorios y dos banos.

> ORIGEN: Finca #29,404, inscrita al folio 221 del tomo 1013 de Rio Piedras
> Norte, inscripcion 1ra.

> PROPRIETARIO REGISTRAL: Dale Chester Browne.

4.     ONE 1985 50' CHEROKEE MOTORBOAT, "MUSIC LADY," PR7378AA,

registered to Jose Matos Lugo.

5.     ONE 1998 FORD EXPEDITION, BLUE, PR LICENSE CYC410, registered to Dale

Chester Browne.

B. **Money Laundering Forfeiture**

By virtue of the commission of the offense of conspiracy to commit money laundering as

charged in Count Two of this indictment, defendants

**[1] UBALDO RIVERA-COLON,**

[3] **OSCAR TRINIDAD-RODRIGUEZ,**
[4] **RUBEN ESTRADA-RODRIGUEZ,**
[5] **BASILIO RIVERA-RODRIGUEZ,**
[6] **ALEXIS ALICEA-KIPP and**
[7] **ELENA CORCHADO-PERALTA,**

shall forfeit to the United States pursuant to Title 18, United States Code Section 982(a)(1) any and

all property, real and personal constituting, derived from or traceable to proceeds of money

laundering, to wit, more than $2,000,000, as to which property the said defendants are jointly and

severally liable, and any and all property, real and personal, involved in money laundering, and all

property traceable to such property, including but not limited to:

1.    ONE URBAN APARTMENT #301, CONDOMINIUM CAPARRA CLASSIC,

ORTEGON STREET, GUAYNABO, P.R., more fully described at the property registry for the

Commonwealth of Puerto Rico as follows:

> PROPIEDAD HORIZONTAL: Unidad designada #301, localizada en el
> piso 3, tercer nivel del Condominio Caparra Classic, ubicado en el Barrio
> Pueblo Viejo de Guaynabo, Puerto Rico.  Esta unidad tiene un area neta
> privada de aproximadamente 3,516.00, equivalentes a 326.77 metros
> cuadrados. Colinda por el: NORTE: en una distancia de 65' con pared
> exterior del edificio; SUR: en una distancia de 64'10" en parte con la unidad
> designada #302 y en parte con vestibulo del piso, con pared colindante con
> conducto al ascensor y con pared colindante con escalera del edificio; ESTE:
> en distancia de 65' 7", con pared exterior del edificio y por el OESTE: en
> distancia de 65' 7", con pared exterior del edificio.  Consta de una antesala,
> por donde tiene su entrada principal, un medio bano, una sala, un comedor,
> una terraza que queda al Este del edificio, una terraza que queda al Oeste del
> edificio, un cuarto de maquina de los aires acondicionados, un linen closet,
> una lavanderia, cuatro dormitorios cada uno con un cuarto de bano y un salon
> familiar consiste de una unidad con divisiones interiores, la cual tiene acceso
> al pasillo comun a traves de su puerta principal.
>
> ORIGEN: Finca #35,178, inscrita al folio 292 del tomo 984 de Guaynabo,
> inscripcion 1ra.
>
> PROPRIETARIO REGISTRAL: Lourdes Colon Ortiz.

Indictment
Page No. 28

2.    ONE RURAL PROPERTY located at B-4 PASEO PANORAMICO, VILLAS DE

MONTE VERDE, PONCE, P.R., more fully described at the property registry for the

Commonwealth of Puerto Rico as follows:

> RUSTICA: Predio de terreno ubicado en el Barrio Montes Llanos del termino
> municipal de Ponce, Puerto Rico, identificado como el solar Cuatro-B (4-B)
> del plano de inscripcion de la Urbanizacion Villas de Monte Verde,
> compuesto de cuatro mil metros cuadrados (4,000 M/C) colindando al
> Noreste, de los puntos dos al diez del plano de inscripcion en ocho
> alineaciones que suman noventa y seis metros con diez centimetros (96.10)
> con la carretera principal de la Urbanizacion. Al Oeste, del punto uno al
> punto diez, en ciento diez metros (110m) con el solar 5-B; y al Sur, del punto
> uno al punto dos, en setenta y tres metros con cincuenta centimetros (74.50)
> con el solar 3-B, formando una punta o cuchilla en dicho punto uno.
>
> ORIGEN: Finca #819, inscrita al folio 264 del tomo 886 de Ponce II,
> inscripcion 4a.
>
> PROPRIETARIO REGISTRAL: Ubaldo Rivera Archilla.

3.    ONE 1985 50' CHEROKEE  MOTORBOAT,  "MUSIC LADY,"  PR7378AA,

registered to Jose Matos Lugo.

## C. Substitute Assets

If any of the property described above as being subject to forfeiture under either paragraph

"A" or "B" above, as a result of any act or omission of the defendants:

1. Cannot be located upon the exercise of due diligence;

2. Has been transferred or sold to, or deposited with a third person;

3. Has been placed beyond the jurisdiction of the court;

4. Has been substantially diminished in value; or

5. Has been commingled with other property which cannot be subdivided with difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and

Indictment
Page No. 29

Title 21 United States Code, Section 853(p) to seek forfeiture of any other property of said

defendants up to the value of the forfeitable property, including but not limited to:

ONE RURAL PROPERTY located at LOT B, KM.0.4, HIGHWAY 795, AGUAS BUENAS,

P.R., more fully described at the property registry for the Commonwealth of Puerto Rico as follows:

RUSTICA: Predio de terreno radicado en al Barrio Bairoa de Aguas Buenas,
compuesta de 3,888.7104 metros cuadrados, equivalentes a 0.9893 cuerda,
en lindes por el: NORTE: con remanente de la finca principal; por el SUR;
con la Carretera Estatal #795; ESTE: con remanente de la finca principal y
Carretera Estatal #795 y OESTE: con la Carretera Estatal #795.

ORIGEN: Finca #11,697, inscrita al folio 91 del tomo 263 de Aguas Buenas,
Seccion II de Caguas.

PROPRIETARIO REGISTRAL: Basilio Rivera Rodriguez y Victoria
Velazquez Flores.

All in violation of Title 18 United States Code, Section 982 and Title 21 United States Code,

Section 853.

GUILLERMO GIL
United States Attorney

JORGE VEGA-PACHECO
Assistant U.S. Attorney
Chief, Criminal Division

ROBERT A. KNIEF
Trial Attorney
United States Department of Justice

Dated:   4 - 26 - 00